**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

**No. 5:11-CV-00048-FL**

DYEANNE CLARK,                      )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )
                                    )      **MEMORANDUM &**
                                    )      **RECOMMENDATION**
MICHAEL J. ASTRUE,                  )
Commissioner of Social              )
Security,                           )
                                    )
        Defendant.                  )
_____            )

        This matter is before the Court upon Plaintiff's motion for judgment on the pleadings

(DE-31) and Defendant's motion for judgment on the pleadings (DE-33).   Plaintiff responded to

Defendant's motion for judgment on the pleadings (DE-35), and the time for the parties to file any

further responses or replies has expired.   Accordingly, the matter is now ripe for adjudication.

Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for the entry of

a memorandum and recommendation.   For the following reasons, it is RECOMMENDED that

Plaintiff's motion for judgment on the pleadings (DE-31) be DENIED, that Defendant's motion for

judgment on the pleadings (DE-35) be GRANTED, and that the final decision by Defendant be

AFFIRMED.

**I.        STATEMENT OF THE CASE**

        Plaintiff applied for supplemental security income benefits ("SSI") on September 17, 2008,

alleging that she became unable to work on September 1, 2008 due to black outs, lack of memory,

and attention deficit disorder. (T.pp.13, 49, 164, 168). Her application was denied initially and upon reconsideration. (T.pp.13, 51, 55). An Administrative Law Judge ("ALJ") held a video hearing on the matter April 29, 2010, during which a vocational expert ("VE") testified. (T.pp.24-48, 101). In a decision dated April 30, 2010, the ALJ determined Plaintiff was not disabled. (T.p.10-23). The Social Security Administration's Office of Disability Adjudication and Review ("Appeals Council") denied Plaintiff's request for review on December 4, 2010, rendering the ALJ's determination as Defendant's final decision. (T.pp.1-5). Plaintiff filed her complaint with this Court on February 3, 2011. (DE-5).

## II.  DISCUSSION

### A.  Standard of Review

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.

"Under the Social Security Act, [the court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, [the court should not]

undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

The Social Security Administration has promulgated the following regulations establishing a sequential evaluation process to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

**B. ALJ's Findings**

In the instant action, the ALJ employed the sequential evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. (T.p.15). At step two, the ALJ found that Plaintiff suffers from the following severe impairments: (1) cervical facet arthritis; (2) post-traumatic stress disorder; (3) acromiovascular joint narrowing in her left shoulder; (4) hypertension; and (5) major depressive disorder. (T.p.15). However, the ALJ determined that these impairments or combination of impairments were not severe enough to meet or medically equal one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

(T.p.15).   Based on the record as a whole, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform light work with a number of restrictions.   (T.p.17).

The ALJ then proceeded with step four of his analysis and determined that Plaintiff had no past relevant work.   (T.p.21).   However, relying upon the testimony of the VE and information contained in the *Dictionary of Occupational Titles* ("DOT"), the ALJ found that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."   (T.p.23).   Based on these findings, the ALJ determined that Plaintiff was not disabled.   (T.p.23).   The ALJ's findings were based upon the following evidence in the record.

### C.   Plaintiff's Testimony and Other Evidence of Record

Plaintiff was forty-nine years old with an eleventh-grade education at the time of the alleged onset of her disability.   (T.p.27).   She testified that she does not work because she "ache[s] constantly all the time [in her] shoulders and . . . back" and her left arm is "numb with tingling feelings in it all the time."   (T.p.28).   In addition, Plaintiff is excessively forgetful.   She "just can't remember . . . what [she's] doing."   (T.p.28).   Plaintiff often has difficulty sustaining a conversation because she is easily distracted and loses her train of thought:

> "And you're talking, if somebody just knock[s] on the door or whatever, and like, you know, where was I, what was I talking about.   And then if you tell me what I was talking about, I still can't get it, what I was trying to say.   I can't get my point across so that I forgot."

(T.p.32).   Plaintiff discontinued her treatment for depression and anxiety because her physicians prescribed "too much medication" that "made [her] head feel funny" and "slowed [her] down even more," such that she "didn't hardly think about [any]thing."   (T.pp.30-31).   Instead, Plaintiff was "just there."   (T.p.31).   The medication also made Plaintiff feel as if "someone [was] squeezing [her] head."   (T.p.37).   Plaintiff described having "blackouts" three or four times per year.

4

During these "blackouts" Plaintiff loses all focus.  For example, Plaintiff becomes lost while driving a car.  Because of this, Plaintiff restricts her driving to town and does not drive long distances.  (T.pp.31-32).

Plaintiff lives with her adult son and daughter, who "do just about everything" for her.  (T.p.33).  Plaintiff can "fix . . . something to eat" and bathe herself, but she cannot do laundry without assistance from her daughter, who reminds her "to get [her] clothes, put them in the dryer, stuff like that."  (T.p.33).  When she goes grocery shopping, Plaintiff's children "write down a list" and accompany her because, as Plaintiff explained, she wouldn't otherwise "get what [she] went there for."  (T.p..33-34).  When Plaintiff reads or watches a television show, she usually forgets what she has read or seen.  (T.p.38).  Plaintiff remains in bed all day at least three days a week.  (T.p.35).  On an average day, Plaintiff "sit[s] around the house" and watches television.  (T.p.43).  On other days, Plaintiff's daughter takes her out and they "just ride around," window shop, or visit a salon so that Plaintiff can "get [her] nails done."  (T.p.36).

Plaintiff suffers from hallucinations on a daily basis.  Plaintiff sees "figures of people."  The hallucinations "throw[] [her] off . . . whatever [she's] trying to do" and she often "start[s] talking to them . . . to try to make [her]self feel better."  (T.p.35).  Because she realizes that no else sees the figures, Plaintiff "just [doesn't] say anything to anybody anymore" about her hallucinations.  (T.p.35).

Plaintiff socializes with "[v]ery few" other people.  (T.p.37).  A friend visits her once or twice a week, but Plaintiff does not visit anyone else.  (T.p.43).  Plaintiff enjoys fishing, but has not fished for "a couple of years."  (T.p.37).  Plaintiff's appetite varies, but she sleeps well as long as she takes her pain medication.  (T.p.36).  The worst pain is in her neck and left shoulder.  Plaintiff described her neck pain as a constant, burning feeling.  Plaintiff relieves the pain by

5

rotating and "popping" her neck and shoulder and by taking medication to help her sleep. Plaintiff can only walk "about a block" before she becomes uncomfortable, but the pain does not prevent her from walking. Plaintiff can stand comfortably "about 20 minutes" before her back and legs hurt. (T.p.42). She believes, however, that her "biggest obstacle" to regular employment is her "mental" condition because "the older [she] get[s], the worse it's getting." (T.p.44). Plaintiff stated that no one had ever been able to explain the cause of her mental condition, although a "psychiatrist told [her] . . . it was ADD." (T.p.44).

An independent vocational expert, Raymond E. Cestar, testified at Plaintiff's hearing. (T.pp.45, 134). The ALJ posed the following hypothetical to Mr. Cestar:

> Assume a person of [Plaintiff's] age, education, and work experience is able to do light work, except the person is further limited in that they should only occasionally climb ramps or stairs, never climb ladders, ropes or scaffolds; only occasionally stoop, kneel, crouch, bend or crawl; should not overhead reach. They can occasionally overhead reach bilaterally. And they . . . can occasionally have rotation, flexion, or extension of the neck, only occasionally. Should avoid concentrated exposure to operation and control of moving machinery, and unprotected heights.
> Is further limited in that this person should work in a low-stress job defined as having only occasional decision-making required; only occasional changes in the work setting. Only occasional interaction with the public, coworkers and supervisors in the job where the work is limited to simple, routine, and repetitive tasks. In the work environment free of fast-paced production requirements involving only simple, work-related decisions with few/any workplace changes. With the ability to do that work and those limitations . . . is there any work they could do?

(T.p.46). Mr. Cestar replied that such an individual could work as a housekeeper, cafeteria attendant, or as a mail clerk, and that these positions existed in significant numbers in the local and regional labor markets. (T.p.46). If such a person were unable to "maintain the appropriate concentration, persistence, and pace to perform even simple, routine, repetitive tasks" however, Mr. Cestar believed it "very unlikely" that such an individual could perform any work.

The medical evidence supporting Plaintiff's claim is summarized in pertinent part as

6

follows:

Plaintiff introduced records of the outpatient treatment she received from August 2005 until January 2008 at Summit Pointe, a mental healthcare provider located in Michigan, where Plaintiff lived until moving to North Carolina in September 2008 to live with her daughter. (T.pp.329-338). Plaintiff sought treatment at Summit Pointe for anxiety, depression and panic attacks. In addition, Plaintiff reported her concern "about blackouts occurring when driving." (T.p.329). In fact, Plaintiff "sold her car due to fear of driving." (*Id.*). Plaintiff was also "having issues with seeing things such as a black shadow figure in her apartment." (T.p.331). She reported needing assistance "because her memory [was] so poor and [she felt] that she [was] getting increasingly confused." (T.p.331). At her September 20, 2007 therapy appointment, Plaintiff was engaged, cooperative, and coherent; she was also alert and oriented, with appropriate attention and normal cognition. (T.pp. 331-32). However, her thought processing was paranoid, she was depressed and sad, and she was experiencing short term memory problems, as well as auditory and visual hallucinations.

On November 6, 2007, one of the Summit Pointe physicians, Payton Brown, M.D., completed a psychological evaluation of Plaintiff and diagnosed her with major depressive disorder, recurrent, severe without psychotic features, dissociative fugue, alcohol dependence, and a reading disorder. (T.p.335). Dr. Brown noted that Plaintiff had a history of "multiple traumatic brain injuries with brief coma." (T.p.336). Dr. Brown prescribed the antidepressant Nortriptyline for Plaintiff and recommended she receive psychotherapy. (*Id.*). At a medication review on January 29, 2008 with Dr. Brown, Plaintiff reported "feeling better mentally" and denied depression. Her chief complaint was cramps in her legs at night. (T.p.337).

On October 15, 2008, interviewer S. Williams at the local field office for the Social

Security Administration reported that Plaintiff has difficulty in the following areas: understanding, coherency, concentrating, talking and answering. (T.p.165). The report states that Plaintiff visited the field office several times, and that "each time some[one] had to accompany her." Plaintiff "appeared to be in a daze and had difficulty answering the questions," and "apologized for not being able to remember." (T.pp.165-66).

Edward Crane, ED.D., with Disability Determination Services of the North Carolina Department of Health and Human Services, evaluated Plaintiff on November 1, 2008. (T.pp.242, 247). Dr. Crane noted that Plaintiff's daughter transported her to the evaluation. According to Dr. Crane, Plaintiff is a "poor historian" with a "history of dissociative fugue, alcohol abuse as well as depression and anxiety." (*Id.*). Plaintiff told Dr. Crane she "cannot focus on anything," "forgets what she is talking about" and "does not know 'what's going on.'" (*Id.*). In addition, Plaintiff has "a history of physical abuse." A former boyfriend beat and choked Plaintiff until she was unconscious on several occasions, which Dr. Crane believed could have resulted in "some possible neurotrauma." (*Id.*). Plaintiff was "living on the streets previously in Michigan" until she "got involved with a mental health center there and she came to North Carolina [to] live with her daughter." (*Id.*). Plaintiff believed she was "sleeping too much." She reported going to bed at nine p.m. and sleeping until seven a.m., as well as sleeping "quite a bit during the day." Her medications included Verapamil, Nortriptyline, and Cyclobenzaprine. (*Id.*).

With regard to her daily functioning, Plaintiff told Dr. Crane she lives with her daughter and son and "spends a lot of time resting and sitting around the house." (T.pp.243,248). Plaintiff "does some of the cooking, although she is easily distracted." Dr. Crane reports that "[o]ne gets a sense that [Plaintiff's] day-to-day activities are generally somewhat sedentary" and that "she seems to have little contact except with a couple of neighbors and her family." (*Id.*).

8

Plaintiff's daughter "does most of the cleaning" and "the shopping, although [Plaintiff] may accompany her daughter at times." Plaintiff could drive, however.

With regard to her mental status, Plaintiff has a "history of anxiety, panic attacks and depression" and complained of "decreased energy, loss of interest in previously enjoyable activities, and a long history of difficulty with attention and concentration." (*Id.*). During her examination, Dr. Crane found her "thought processes . . . generally coherent . . . although [a] little tangential at times." (*Id.*). Plaintiff denied "obsessions, phobias, and homicidal thoughts." Although Plaintiff considered suicide in the past, she had no present thoughts or plans for suicide. "In terms of perceptual disturbances and hallucinations, [Dr. Crane did] not think she has had any frank hallucinations, but does state she sees shadows sometimes." (*Id.*). She was "generally alert and oriented." Plaintiff could retain five words after four repetitions, and after five minutes could recall all five of the words. She could repeat five digits forward and three digits backward. In terms of recent memory, Plaintiff reported attending a Halloween party at her daughter's neighbor's house the previous evening, where she ate Chinese food and then returned home. Dr. Crane estimated that Plaintiff's intellectual capacity was "in the low average possibly the borderline range of intellectual functioning." (T.pp.244, 249).

In summary, despite her limitations, Dr. Crane believed Plaintiff was capable of "simple routine repetitive tasks." He found "moderate impairment in her capacity to interact with others, responding to supervision, peers and coworkers." (*Id.*). Her capacity for concentration, persistence, and pace was "mildly to moderately impaired." Because her history was "consistent with a neurotrauma," Dr. Crane felt that "additional psychological testing to include memory testing may be of some additional value." (*Id.*). However, Dr. Crane found Plaintiff capable of "manag[ing] benefits in her own interest." (*Id.*).

9

A consultative examination performed by Southeast X Ray, Inc. on November 17, 2008, found that Plaintiff had normal range of motion. (T.pp. 251-52). Alan Cohen, M.D., also evaluated Plaintiff on November 17, 2008 for the purpose of a disability determination. (T.p.253). Dr. Cohen noted that Plaintiff was "diagnosed with attention deficit disorder in 2006 and has been treated with medication for depression and anxiety." (T.p.253). She was in counseling until September when she left Michigan. Her physical examination revealed "[s]teady gait, normal station, muscle strength [of] 5/5 bilaterally, [and the ability to] raise arms overhead, pinch, grasp, and manipulate objects with [her] hands." (T.p.254). Plaintiff could "sit, stand, squat, and ambulate." (*Id.*). Her spine was "normal without deformity or tenderness" and her straight leg testing was negative. (*Id.*). Plaintiff was oriented, with intact recent and remote memory. Dr. Cohen diagnosed Plaintiff with depression, anxiety, and hypertension. He found that she needed no assistive device for ambulation, and that her ability "to sit, stand, move about, lift, carry, handle objects, hear, speak, travel, and [her] stamina" were not impaired. (T.p.255).

Plaintiff was referred to Evergreen Behavioral Management ("Evergreen") for outpatient therapy and medical management to "develop and utilize coping skills to manage her depressive symptoms and PTSD symptoms." (T.p.350). Plaintiff visited Evergreen on December 12, 2008 to get her Nortriptyline refilled. (T.p.339). Plaintiff stated that the medication did not "mess with her head" and "fe[lt] more normal" than her past prescriptions for Paxil, Zoloft, and Ambilify, all of which made her "feel funny in the head." (T.p.339). Without the medication, Plaintiff stated she was "tired all the time, moody, [and] depressed." (*Id.*). Plaintiff described her depression as "achy, lack of motivation, lack of energy, trouble with concentration, poor memory, isolation, crying, low self-esteem." (*Id.*). She "worr[ied] a lot about [her] family and [her]self" and was "scared about life." (*Id.*). Plaintiff reported "seeing shadows/people walking around"

10

since she was a child. When Plaintiff talks to the shadows, they do not respond. She also hears "voices of someone calling her name, non-commanding." Plaintiff has nightmares and flashbacks related to childhood physical and sexual abuse, and physical abuse as an adult by her boyfriend. Long-term memory problems were noted, as well as a family history of psychiatric illness. Upon examination, Plaintiff was alert and oriented; her attention, concentration, recent memory, speech, and thought processes were within normal limits; her abstract reasoning was concrete and her judgment fair; and her insight was good. (T.p.341). Plaintiff was diagnosed with post-traumatic stress disorder and major, recurrent and severe depressive disorder with psychotic features. (T.p.341). Plaintiff was referred for outpatient therapy and continued on Nortriptyline.

Consultant Ben Williams, Ph.D., completed a "psychiatric review technique" on February 12, 2009 regarding Plaintiff's disability determination. (T.p.256). Dr. Williams noted both anxiety disorder and personality disorder, and found that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (T.p.266). Dr. Williams found Plaintiff's allegations of her limitations only "partially credible, as [her] statements [were] not fully consistent [with the] medical findings." (T.p.268).

Dr. Williams also conducted a mental residual functional capacity assessment and found Plaintiff moderately limited in her ability to (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5)

11

interact appropriately with the general public; (6) respond appropriately to changes in the work setting; (7) set realistic goals or make plans independently of others. (T.p.270-71). He believed her capable of understanding and remembering simple, three-step instructions and able to sustain sufficient attention to complete simple routine tasks for a two-hour period at a non-production pace. (T.p.272). Although Dr. Williams felt Plaintiff had "some deficits in sustained concentration" and would "have some difficulty adapting to changes in the workplace," he believed she "should be able to function with a stable work assignment." (*Id.*).

Medical consultant Janet Johnson-Hunter, M.D. completed a residual functional capacity assessment on May 26, 2009. (T.p.323). Dr. Johnson-Hunter believed Plaintiff capable of: occasionally lifting fifty pounds; frequently lifting twenty-five pounds; standing/walking with normal breaks for a total of about six hours in an eight-hour workday; sitting with normal breaks for a total of about six hours in an eight-hour workday; and unlimited pushing and pulling. (T.p.317). Plaintiff could only occasionally climb ladders, ropes or scaffolds. (T.p.318). Dr. Johnson-Hunter would limit Plaintiff's climbing of heights due to her cervical back condition. (T.pp.318, 320). Dr. Johnson-Hunter found Plaintiff's statements regarding her limitations "partially credible" and noted there was "no obj[ective] evidence supporting [Plaintiff's] allegation of blackouts." (T.p.323).

Plaintiff sought medical attention at Cape Fear Valley Health System on February 10, 2009, for pain in her neck, shoulder, and left knee. (T.p.291). Physicians there diagnosed her with "[s]evere facet arthritis with an anterior sublaxation of C4 on C5." (*Id.*). There also appeared to be "very minimal displacement of the distal end of the clavicle in relationship to the AC joint" in her left shoulder. (T.p.293). Examinations of Plaintiff's knee and right shoulder were "unremarkable." (T.pp.292, 294).

Plaintiff received care at the Cumberland County Health Department on July 14, 2009 for severe pain in her cervical and lumbar areas. Plaintiff was referred for pain management and an MRI was scheduled. (T.p.353). The MRI revealed normal alignment of Plaintiff's cervical vertebrae with mild ventral hypertrophy at the C4-5 and C5-6 levels. At the C3-4 level, there was an annular bulge with a midline annular tear, mild approximation of the ventral thecal contour, as well as "evidence for right-sided facet arthropathy and uncovertebral hypertrophy with mild right foraminal narrowing." (T.p.355). At the C4-5 level, there was "uncovertebral hypertrophy and facet arthropathy," bilateral foraminal narrowing, and a midline annular tear but no focal protrusion." (*Id.*). At C5-6, there was "no significant compromise of central canal or foramina suggested" and "[m]inimal annular bulge and mild facet arthropathy." (*Id.*). Plaintiff's lumbosacral MRI showed normal alignment, no evidence of focal disk protrusion, mild facet arthropathy at L5-S1, mild annular bulge at L4-5 with "very minimal foraminal narrowing." (T.p.356).

Plaintiff returned to the Cumberland County Health Department on November 19, 2009, complaining of pain in her left shoulder and arm, and sharp pain under her right breast and stomach area. (T.p.371). On February 26, 2010, Plaintiff visited Cape Fear Valley Primary Care Practices, complaining of severe pain in her back and neck, which she rated level eight on a scale of zero to ten. (T.p.362).

Plaintiff sought treatment from Meisha K. Abbasinejad, M.D., on April 5, 2010, at Cape Fear Physical Medicine and Rehabilitation Associates for "neck ache, burning sensation in neck, neck pain, back ache, burning sensation in back [and] back pain." (T.p.375). She was not in acute distress, however. (T.p.376). She described her pain as "constant, achy and dull" and rated the pain level as ranging from 7/10 to 10/10. (T.p.375). Her symptoms worsened with

13

activity, but improved when she changed positions and took a muscle relaxer. (T.p.375). Dr. Abbasinejad noted that Ultracet had given her some relief, but that she had tried no other medications except ibuprofen and was not receiving physical therapy. Plaintiff visited a chiropractor twice a month, but the relief only lasted "for a day or two." (T.p.375). Plaintiff also reported increased anxiety level and sleep disturbances. Upon examination, Plaintiff had fully functional range of motion in her neck, lumbar and thoracic spine, with minimal tenderness of the lower cervical paraspinals. Her straight leg raising test was negative bilaterally and her gait was normal. Dr. Abbasinejad recommended physical therapy and continued use of Ultracet for severe pain. (T.p.377).

Plaintiff also submitted a progress report dated April 28, 2010, from her chiropractor, Dr. Robert Twaddell. (T.p.378). Dr. Twaddell noted that Plaintiff was referred to his clinic for evaluation and treatment of severe neck and shoulder pain and had "been seen on a course of conservative clinical management for 13 visits within 12 months." (*Id.*). Dr. Twaddell's diagnosis was severe multi-level cervical facet arthritis with anterior subluxation, cervicogenic headache, chronic post-traumatic shoulder AC joint separation, and cervical and shoulder myofascitis. (*Id.*). According to Dr. Twaddell, the trauma to Plaintiff's spine had caused a general weakening of the soft tissue structure and "[t]he ligaments involved have become overstretched and torn, giving rise to, even in its healed state, spinal instability." (*Id.*). Dr. Twaddell believed that "[p]ermanent disability is expected due to her severe cervical facet arthrosis and shoulder AC separation."

Further facts are set out as necessary in evaluating Plaintiff's arguments.

III.    **ANALYSIS**

Plaintiff argues the ALJ (1) improperly evaluated her credibility, resulting in an RFC

unsupported by substantial evidence and (2) erred in finding that Plaintiff's major depressive disorder did not meet the criteria of Listing 12.04. The undersigned concludes there was substantial evidence to support each of the ALJ's determinations. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's arguments rely primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, this Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff essentially requests this Court do, her claims lack merit. The undersigned will nonetheless address Plaintiff's specific assignments of error.

A. **The ALJ properly assessed Plaintiff's credibility**

Plaintiff challenges the ALJ's determination regarding the credibility of her testimony. The ALJ found that while Plaintiff's "medically determinable impairments could be reasonably be expected to cause the alleged symptoms," Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent" with the RFC assessment. (T.p.18). The ALJ explained that, with regard to Plaintiff's back and neck pain, the objective medical evidence did not support the degree of limitation alleged. After summarizing the results of Plaintiff's MRIs and x-rays, the ALJ found that

> The objective evidence . . . shows that the claimant does have fairly severe arthritis and anterior sublaxation in her cervical spine which would limit her ability to lift and use her neck to some degree. However, x-rays of the shoulders, knee,

15

and lumbar spine revealed only mild findings or were negative. Hence, there appears little support for the claimant's allegations that she could not walk more than a block or stand for more than twenty minutes.

Similarly, exam findings are not supportive of the claimant's allegations. The claimant was examined by Alan Cohen, M.D. on November 17, 2008. Exh. 3F. On physical exam Dr. Cohen noted negative straight leg raise, steady gait, normal station, 5/5 muscle strength in the lower extremities bilaterally, and normal reflexes and sensation in the upper and lower extremities. The claimant could sit, stand, squat, and ambulate without difficulty. The claimant's range of motion was normal. Similarly, the claimant had been noted to have normal range of motion in the majority of her visits to her chiropractor. Exh. 22F. The claimant was examined by [Dr. Abbasinejad] on April 5, 2010. Exh. 21F. [Dr. Abbasinejad] found full range of motion of the cervical, thoracic, and lumbar spine, upper extremities, and lower extremities. The claimant's neurological tests were normal, and the claimant had only minimal tenderness in the lower cervical paraspinals. Exh. 21F, p. 2. The claimant was examined at Cumberland County Health Department on February 2, 2009, April 15, 2009, and November 19, 2009. These exams also found normal gait, station, stability and strength. Exh. 8F, pp. 7,9; 20F, p. 8.

Nor is the claimant's treatment record consistent with her complaints of pain and limitation. The claimant began treatment with a chiropractor in April, 2009[;] over the last year the claimant has seen this chiropractor 12 times. Exh. 22F. Other than this, the claimant takes medications such as corisprodal - and muscle relaxer, and tramadol. Exh. 20E. The claimant has not undergone any other treatment modalities, such as physical therapy (although this was recently recommended), injections, or massage. She does not use a cane to ambulate, despite her allegations of an inability to ambulate more than a block.

Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

(T.pp.18-19).

With regard to her "complaints of depression, mental slowness, forgetfulness, and low motivation" the ALJ found that the evidence was "similarly unsupportive" of the degree of limitation alleged by Plaintiff. After summarizing Plaintiff's treatment history, the ALJ

16

concluded that

> This record of examinations and treatment do[es] not support the claimant's allegations. Her mental status results . . . show[] only minimal impaired memory, and when administered by Dr. Crane, she was able to recall five objects after five minutes and recall what she had done the day before. The claimant currently takes no medications for her mental impairments because they slowed her down. However, she has also not followed up with suggestions to go to counseling or therapy. Her activities of daily living, while not full, do show that she cooks, does laundry, goes out with children, and attends Halloween parties. While these activities do not ipso facto demonstrate an ability to engage in sustained work activity, they do suggest a far greater ability to function than that alleged by the claimant.
>
> In regard to the claimant's allegations of black outs, the record shows that she complained of these in 2005, 2006, and 2007, but has not made these complaints to her present treating physicians. These only happen 3-4 times a year and only last a few minutes. There is no independent verification of these episodes, nor any objective evidence which would explain them. Therefore they do not appear to significantly inhibit her ability to function.
>
> The undersigned notes that the field office employee who took the claimant's application noted that the claimant came to the office numerous times, always had someone accompany her, and looked as though she were in a daze and had difficulty remembering. Exh. 2E. The undersigned finds this observation inconsistent with the claimant's mental status exam results and lack of ongoing treatment. If the claimant were truly as dazed and confused as observed, and was cognitively dissociated on a persistent basis, she would reasonably be expected to be compliant with taking medications for her own safety.

(T.p.20).

Plaintiff specifically objects to the ALJ's finding that her daily activities "suggest a far greater ability to function than that alleged" by her. Plaintiff contends the evidence of her daily activities fully supports her claim of disability and the ALJ erred in finding otherwise. Plaintiff accuses the ALJ of "cherry picking" from the record and ignoring "key evidence." She contends that the evidence as a whole shows that she "can do little without a great deal of help and has trouble functioning around others." (DE-32, p.10). Plaintiff also asserts that the ALJ erred in concluding that if she were "truly as dazed and confused as observed, and was cognitively

17

dissociated on a persistent basis, she would reasonably be expected to be compliant with taking medications for her own safety." Plaintiff argues the ALJ erroneously weighed her noncompliance with her medications against her without considering the reasons for her noncompliance. Plaintiff testified that she stopped taking her medication because it made her "feel funny" and "slowed [her] down." Thus, argues Plaintiff, the ALJ "did not properly consider that [she] ceased taking her medications due to unbearable side effects as a mitigating factor when assessing her credibility" in contravention of Social Security Ruling 96-7p. In summary, Plaintiff contends the ALJ's credibility analysis is unsupported by the evidence of record. The undersigned disagrees.

The detailed findings of fact demonstrate that the ALJ gave proper weight to all of Plaintiff's limitations and impairments in assessing her credibility. Likewise, the ALJ's citations to Plaintiff's medical records constitute substantial evidence supporting his assessment. In evaluating a claimant's credibility, an ALJ considers, in addition to the objective medical evidence, the following factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of medication; (5) treatment other than medication; (6) other measures used to relieve pain or other symptoms; and (7) other factors. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Here, there is substantial evidence of record to support the ALJ's credibility determination. The ALJ determined that Plaintiff's subjective complaints were inconsistent not only with her activities of daily living, but with the objective medical evidence and her treatment regimen. For example, the ALJ noted that the x-rays of Plaintiff's shoulders, knee, and lumbar spine "revealed only mild findings or were negative." (T.pp.18, 292-94). The ALJ also relied on Dr. Cohen's unremarkable physical examination, which showed a "negative straight leg raise, steady gait, 5/5

18

muscle strength in the lower extremities bilaterally, and normal reflexes and sensation in the upper and lower extremities." (T.pp.18-19, 252, 254). Dr. Abbasinejad's April 2010 examination was similarly unremarkable; Plaintiff had "full range of motion of the cervical, thoracic, and lumbar spine, upper extremities, and lower extremities," normal neurological functioning, and only minimal tenderness in the cervical paraspinals. (T.pp.19, 376). The ALJ also noted the unremarkable physical examinations from the Cumberland County Health Department, which generally showed full range of motion, a normal gait and station, and normal stability and strength. (T.pp.19, 285, 351,355, 366, 370).

Substantial evidence also supports the ALJ's determination that Plaintiff's alleged mental symptoms were not fully credible in light of the objective medical evidence. For example, Plaintiff's December 2008 examination at Evergreen showed normal concentration, normal recent memory, normal thought process, concrete abstract thinking, fair judgment, and good insight. (T.pp.19, 341). Dr. Crane's November 2008 examination showed that Plaintiff recalled five words after a five-minute delay, had intact recent memory, and had a coherent, if somewhat tangential thought process. (T.pp. 20, 243).

Further, the ALJ found that Plaintiff's subjective complaints were inconsistent with her conservative treatment regimen of medication and chiropractic adjustments. The ALJ noted that Plaintiff had not "undergone any other treatment modalities, such as physical therapy (although this was recently recommended), injections, or massage" and did "not use a cane to ambulate." (T.p.19). Similarly, the ALJ noted that Plaintiff "has also not followed up with suggestions to go to counseling or therapy." (T.p.20). "[W]hen considered with other information, the routine nature of a course of treatment may indicate that a condition is not as severe as a plaintiff's subjective complaints may otherwise indicate." Viverette v. Astrue, No. 5:07-CV-395-FL, 2008

19

U.S. Dist. LEXIS 95538, at *6-7 (E.D.N.C. Nov. 24, 2008).

While the ALJ did not find Plaintiff's subjective complaints fully credible, the ALJ did not completely reject her complaints. For example, the ALJ found Plaintiff's ability to lift and use her neck was limited based on the MRI of her cervical spine. (T.pp.18, 291). By contrast, the ALJ stated that "there appear[ed] little support for the claimant's allegation that she could not walk more than a block or stand for more than twenty minutes." (T.p.18). The ALJ, therefore, credited Plaintiff's complaints that could "reasonably be accepted as consistent with the objective medical evidence and the other evidence" and gave little weight to those complaints that were not consistent with the objective medical evidence and other evidence of record. 20 C.F.R. § 416.929(c)(4). Because the ALJ provided sufficient reasons for finding Plaintiff's subjective complaints not fully credible, this Court must defer to ALJ's adverse credibility determination. Craig, 76 F.3d at 595-96 (citing 20 C.F.R. § 416.929(c)(4)).

Plaintiff asserts that the ALJ "hinged his credibility attack" on her daily activities and noncompliance with her treatment regimen. (DE-32, p.9). On the contrary, the ALJ extensively evaluated Plaintiff's subjective complaints in light of the objective medical evidence. Plaintiff argues that her daily activities were far more limited than the ALJ stated. Although the ALJ agreed that Plaintiff's daily activities were "not full," the ALJ further noted that "even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." (T.p.19). Plaintiff identifies only one piece of objective medical evidence, Dr. Crane's examination, to attack the ALJ's analysis of her daily activities. (T.p.19). However, Dr. Crane opined that, even with her limitations, Plaintiff could perform "simple, routine repetitive tasks"; was moderately

20

limited in her ability to interact with others and respond to supervision, peers, and co-workers; and was mildly-to-moderately limited in her ability for concentration, persistence, and pace. (T.p.244). The ALJ adopted this opinion and found it consistent with the ability to work. (T.p.21). Plaintiff's reliance on Dr. Crane's examination to buttress her daily activities is therefore misplaced.

Plaintiff also complains that the ALJ did not fully consider the reasons that she did not take antidepressant medication, citing to a December 2008 examination to show that she "didn't like many of her medications for depression because they 'mess[ed] with her head.'" Plaintiff omits the part from this same examination where she stated that her current antidepressant, Nortriptyline, did not "mess with her head" and made her feel "more normal." (T.p.339). Moreover, the ALJ specifically noted that Plaintiff "currently takes no medications for her mental impairments because they slowed her down." (T.p.20). The ALJ then stated, "However, she has also not followed up with suggestions to go to counseling or therapy." (T.p.20). Thus, the ALJ explained that Plaintiff's lack of medication would not explain her lack of therapy.

Because the ALJ properly conducted his credibility determination, which is supported by substantial evidence of the record, Plaintiff's assignment of error lacks merit and is overruled.

**B. The ALJ properly found that Plaintiff did not meet Listing 12.04**

Plaintiff argues the ALJ erred in failing to find that her depressive disorder did not meet the criteria for Listing 12.04. At step three of the sequential evaluation process, the ALJ must determine whether the claimant has a medical condition that satisfies the criteria of a Listing. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, app. 1. The claimant has the burden of proving that an impairment meets the criteria of a Listing. Bowen v. Yuckert, 482 U.S. 137, 146, n.5 (1987). A claimant's impairments must satisfy all the requirements of the Listing. Sullivan

v. Zebley, 493 U.S. 521, 530-31 (1990). An impairment that meets only some of the Listing's requirements "no matter how severely, does not qualify." *Id.*; *see also* Hays, 907 F.2d at 1457-58.

To satisfy subpart B and meet the listing for depressive syndromes, a claimant's impairments must result in (1) a "marked" limitation in two domains or (2) a "marked" limitation in one domain and repeated episodes of decompensation. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B). A marked limitation is established when an impairment seriously interferes with a claimant's "ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).

Here, the ALJ found that

> [Plaintiff's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.
>
> In activities of daily living, the claimant has a mild restriction. On February 12, 2009, the file was reviewed by Ben Williams, PhD. Dr. Williams determined that the claimant had a mild limitation in this area of functioning. The record reveals that the claimant does not take medications for her depression or attend counseling. She does some cooking and laundry around her house. She is able to get along with her neighbors, attends some parties, and goes shopping at times with her children. Therefore, the undersigned concurs that the claimant has a mild limitation in this area of functioning.
>
> In social functioning, the claimant has moderate difficulties. Dr. Williams determined that the claimant had a moderate limitation in this area of functioning. The record reveals that the claimant does not take medications for her depression and PTSD or attend counseling. She is able to get along with her neighbors, attends some parties, and goes shopping at times with her children. Therefore, the undersigned concurs that the claimant has a moderate limitation in this area of functioning.
>
> With regard to concentration, persistence or pace, the claimant has moderate

22

difficulties. Dr. Williams determined that the claimant had a moderate limitation in this area of functioning. The record reveals that the claimant does not take medications for her depression and PTSD or attend counseling. She has some memory problems and has appeared dazed at times. However, her mental status exams reveal good recall and intact recent memory. Therefore, the undersigned concurs that the claimant has a moderate limitation in this area of functioning.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. The claimant has never been psychiatrically hospitalized nor experienced a similar episode of decompensation of the required durational period.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

(T.p.16).

Plaintiff contends she has marked restrictions in activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace, and that the ALJ erred in finding only mild or moderate impairment. She does not contest the ALJ's conclusion that her impairments did not result in repeated episodes of decompensation. However, Plaintiff relies heavily on her own testimony to support her argument, which the ALJ found only partially credible. She cites only one piece of objective medical evidence to suggest that she has a marked limitation in any domain. Specifically, Plaintiff asserts that Dr. Crane's observation of social difficulties and isolation supported a marked limitation in the domain of social functioning. But Dr. Crane ultimately opined that, despite such difficulties, she had no more than a moderate limitation in the ability to interact with others and to respond to supervision, peers, and coworkers. Dr. Crane's opinion, thus, contradicts a finding of a marked limitation in the domain of social functioning. Notably, no medical source opined that Plaintiff's impairments resulted in a marked limitation in any domain, let alone the two domains required by Listing 12.04. Plaintiff has therefore failed to carry her burden of demonstrating that her impairments met the criteria for paragraph B of Listing 12.04. This assignment of error is accordingly overruled.

IV.     **CONCLUSION**

For the reasons discussed above, it is RECOMMENDED that Plaintiff's motion for judgment on the pleadings (DE-31) be DENIED, that Defendant's motion for judgment on the pleadings (DE-33) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Tuesday, January 03, 2012.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE